San-Miguel v. State 















IN THE
TENTH COURT OF APPEALS
 

No. 10-93-147-CR

     JOAQUIN SAN-MIGUEL,
                                                                                              Appellant
     v.

     THE STATE OF TEXAS,
                                                                                              Appellee
 

From the 174th District Court
Harris County, Texas
Trial Court # 636,881
                                                                                                    

O P I N I O N
                                                                                                    

        Appellant was charged by indictment with the felony offense of aggravated robbery, to
which he pleaded not guilty. Appellant was found guilty of the offense after trial by jury. 
Following a punishment hearing, the jury assessed punishment at twenty-five years confinement
in the Institutional Division of the Texas Department of Criminal Justice, from which Appellant
comes to this court upon three points of error. We overrule all of Appellant's points and
contentions and affirm the trial court's judgment.
      The basic facts are as follows:
Patrick Heffernan testified that he works as a security guard for Security Guard
Services, Incorporated. For the past year, he had worked security for Modern Welding
Company at 715 Sakowitz. Heffernan was working a twelve-hour shift at the job site on
June 13, 1992. He began his shift at 6:30 a.m. and ended it at 6:30 p.m. At 6:30, Frank
Calitine, the complainant in this case, relieved him.
Calitine was employed by the same security company. Calitine drove a Dodge Ram
with a camper on the back. He was armed with a black .357 Magnum when he arrived
at the job site. He parked his truck close to the front door of the establishment.
When Heffernan arrived at 6:30 the next morning to relieve Calitine, he saw a gray
car in a ditch and a number of police cars parked on the street. He saw Frank Calitine
lying, bloody, about eight to ten feet from the door of the building. Heffernan went
inside to call his boss who was on his way to the scene. Then he went to punch in and
found Calitine's time card and report log. The last time Calitine had punched in was
4:05 a.m. Heffernan did not see Calitine's truck on the property, and testified that he
saw more than one person in the gray car.
Houston police officer A.C. Leonard testified that, as a patrol officer, he works the
Fifth Ward area of Houston. The area includes the intersection of Farmer and Sakowitz
Streets. Early on the morning of June 14, 1992, Leonard received a call which brought
him to a business at that location. He arrived at the scene at approximately 4:59 a.m. 
He and his partner, Ciro Oliverez, were the first to arrive after the ambulance. By the
time Leonard arrived, the victim was already deceased. The victim was lying in a
parking lot, wearing a light blue shirt, dark blue pants, a Sam Brown belt, and an empty
holster.
Subsequently, Leonard noticed a gray Ford Torino parked approximately 100 to 110
yards south of the parking lot in a ditch. He approached the vehicle and there was no one
in it. As he walked toward the vehicle, two Hispanic males and one Hispanic female
drove up in a white Chevy pickup, got out, and began walking toward the vehicle. 
Leonard asked them questions about the vehicle; the female answered. Based on the
answers she gave, Officer Leonard walked back toward the scene. Leonard determined
that the vehicle did not have anything to do with the scene, and no weapon was recovered
at the scene.
Officer Ken Hilleman of the Houston Police Department testified that, in June of
1992, he was assigned to the homicide division, and worked in the crime scene unit. In
the early morning hours of June 14, 1992, Hilleman received a request to go to the 700
block of Sakowitz. When he arrived, he saw a white male who had been shot lying dead
in the parking lot in front of the Modern Welding Shop. Officer Hilleman found a pair
of glasses to the right of the body, and a fired cartridge case up beyond the head a few
feet. The caliber of the shell casing was 9 millimeter.
Officer Hilleman was later contacted by Sergeant Ott to meet him at the 7000 block
of Waxahachie. When he arrived, he found a Dodge pickup truck parked on the side of
the road. There was blood on the aluminum running board. Hilleman collected another
fired cartridge casing from the driver's side floorboard, and fingerprinted the exterior of
the vehicle. The passenger door of the truck had two "dimples" in the metal where
bullets had been fired from the inside. Bullets had also struck the rear part of the cab and
dented the metal. The caliber of the shell casing recovered from the interior of the
vehicle was 9 millimeter.
David Calitine, the son of the complainant, testified that his father was licensed to
carry a firearm while he was working as a security guard. The complainant carried a
.357 Dan Wesson revolver. David identified the glasses found at the scene as belonging
to his father. David also identified the truck found on Waxahachie as belonging to his
father.
Houston Police Officer Larry Ott testified that he works in the homicide division. 
In the early morning hours of June 14, 1992, he had occasion to "make" a scene in the
700 block of Sakowitz. He and his partner, David Collier, arrived at the scene at
approximately 6:55 a.m. Upon arrival, Ott observed a white male security guard dead
in the parking lot. The victim appeared to have a gunshot wound to the head.
Ott and his partner knocked on doors in the area to determine if anyone had seen or
heard anything. They gathered information and other evidence at the scene. When Ott
and his partner returned to the homicide office, they were informed that Calitine's truck
had been recovered in the 700 block of Waxahachie. Ott went to that location and
observed a truck with the lights still on. The crime scene unit did an exterior
examination of the truck. The truck was then taken to a print stall to be examined for
evidence.
Ott testified that an officer involved with the Crime Stoppers program provided him
with information regarding the instant offense. Ott obtained a photograph of a person
and turned it over to Sergeant Mosceda and Sergeant Escalante of the "Chicano" squad. 
Ott identified Appellant as the person whose photograph he had given the officers.
John Williams testified that he lives at 5543 Tremper. His home is approximately
85 feet from Modern Welding Company's back gate. At approximately 3:00 a.m. on
June 14, 1992, Williams heard a loud grinding or roaring noise. Williams testified that
the noise sounded like a vehicle either skidding on rocks or about to ram into his
property. Williams jumped out of bed and looked out of his bedroom window. He went
to the porch, but did not turn on any lights. He saw two cars. A man opened the
passenger side door of one of the cars and got out. The car from which he exited was
parked in the ditch on the right hand side of Tremper street. Williams stated that the
lighting around the car was sufficient for him to see what was going on. There was also
enough lighting for him to see what was going on between the corner of Sakowitz and
Tremper, all the way over to Modern Welding.
The person who had exited the car proceeded to walk over to Modern Welding and
spoke with the security guard for approximately five to seven minutes. At that time, the
driver of the car was still inside the vehicle attempting to drive it out of the ditch. 
However, he was unable to do so. The passenger then walked back to the car. The
driver got out of the car, and the two talked for about ten minutes. They then proceeded
back over to the security guard, and talked to him for approximately another ten minutes. 
The two men then walked back to the car.
The passenger sat on top of the trunk, and ended up rolling off of the vehicle into the
ditch. He then got up, and the other man opened the trunk and reached in and grabbed
a small object out of the vehicle. The two men then proceeded down Tremper toward
Lockwood Street. Williams watched the men until he could not longer see them, then
went back inside his house and went to bed. Williams identified Appellant as the driver
of the car.
Dr. Vladimir Parungao testified that the victim sustained two entrance gunshot
wounds to the left side of the jaw. There were abrasions on the left and right side of the
forehead. There were also abrasions on the right elbow. Finally, the victim sustained
two exit gunshot wounds on the right upper side of the back almost at the base of the
neck.
Dr. Parungao testified that, based upon his findings, the tip of the gun with which
the victim was shot was beyond six inches but within twenty-four inches from the wound. 
Dr. Parungao stated that a 9 millimeter weapon could have caused the wounds. He
testified that the gun that fired the two shots which killed the complainant was a deadly
weapon.
Sergeant C.T. Mosceda of the Houston Police Department homicide division testified
that he works a special squad known as the Chicano squad. Two days after this offense,
Mosceda and his partner, Escalante, were assigned to the case. Mosceda and Escalante
returned to the scene of offense. They recanvassed the area in an attempt to find
witnesses who had seen or heard something. They also canvassed the area where the
complainant's truck had been found.
Mosceda testified that, near the location where the truck was found, he spoke with
a woman by the name of San-Miguel who lived at 7005 Waxahachie. Mosceda testified
that, on another occasion, he and his partner saw a grayish-colored Ford LTD at the
residence. Mosceda and his partner were given a picture of Appellant when they began
their investigation of the case. After investigating calls for police service that had been
made from 7005 Waxahachie, the officers obtained the name of Gonzalo Cantu. The
officers spoke with Cantu at his place of employment. Officer Mosceda asked Cantu
whether he had any knowledge of Appellant's involvement in the death of a security
officer. Cantu cooperated with the officers.
The officers returned to the Denver Harbor area, where the offense occurred, and
located Appellant for interview purposes. The officers found Appellant in the 6900 block
of Eagle Pass. Two other young men were with him, one of whom was Gonzalo Cantu. 
The three men were standing in the street. Mosceda and Escalante identified themselves
as police officers, asked the men if they were carrying any weapons, and asked for
identification. Mosceda and Escalante conducted a quick pat-down of the men.
After Appellant identified himself, Sergeant Mosceda informed him that they were
investigating a homicide wherein a security officer had been killed. Appellant responded
that he knew the officers were looking for him. He had heard talk from his friends that
the police wished to talk to him. Appellant stated that he was willing to tell the officers
anything they wanted to know. Sergeant Mosceda testified that he asked Appellant if he
was willing to come down to the office on his own free will and talk to the officers about
the matter. Appellant replied that he was.
The officers drove Appellant downtown to the homicide office. Appellant kept
"rambling" that he did not do the shooting. Sergeant Mosceda told him to keep quiet,
that it was best for him to talk to the officers in the office. When they reached the
homicide office, the officers placed Appellant in one of the interview rooms. The
officers videotaped a statement between themselves and Appellant.
Tina Marie Alvarado testified that her brother, Luis Alvarado, is a good friend of
Appellant. Between 4:00 and 5:00 a.m. on the morning of June 14, 1992, Tina was in
her bedroom at 7002 Waxahachie. Luis and his girlfriend, Angela Escamilla, were also
present in the house. Tina heard a knock at the door, and then someone answered it. She
then heard Appellant and Luis and Angela speaking to each other. Appellant told Luis,
"Take me." Appellant then stated that he had killed someone. He repeated that statement
over and over. Appellant wanted Luis to get the car. The conversation lasted five to ten
minutes, then Tina heard her brother going toward the car.
Tina got out of bed and went into the living room. She saw Appellant and Angela
there. Tina asked Appellant what he had done, and he responded, "I fucking killed
somebody." Tina returned to her room. The next morning she awoke at 8:30 and went
outside to the garage to wash her car. She noticed the homicide van at the corner. She
also noticed the truck. When Tina walked into the house, she noticed a wallet on top of
the stereo that she had not previously seen. The wallet was empty.
At about 11:00 a.m., Appellant returned to the house. He and Tina had a
conversation about the murder. Appellant stated that it seemed it was a dream, and
wasn't really happening. Tina asked him if had taken the gun or wallet. Appellant stated
that he had only taken the wallet. Appellant stated that the security guard was shot in the
face three times. Appellant's mother had driven Appellant to get his car out of the ditch. 
Appellant's mother saw the victim's body, and Appellant told her that his friend had
killed him. Appellant's story later changed with regard to who had done the killing:
later, he stated that "Andrew" had killed the complainant. On cross-examination, Tina
testified that Appellant's mother drove a gray Ford LTD.
Angela Escamilla testified that she is Luis Alvarado's common-law wife. Around
4:30 or 5:00 a.m. on June 14, 1992, she was asleep when she heard someone crying. 
She went into the living room where she found Appellant and Luis. Appellant was
crying. Appellant stated, "I fucking killed somebody." He asked Luis to take him to get
his car from the ditch. The two men left the house, and were gone about five to ten
minutes.
When they returned, Angela asked Appellant what had happened, and he said that
he was with some guy named Andrew, and that the car had fallen into a ditch. Appellant
then stated that he had killed a security guard. He showed Angela a wallet which
contained the security guard's identification. The identification bore the name Frank
Calitine. Appellant left the wallet at the house. Appellant stated that he parked the truck
down the street. Appellant's mother then arrived to take Appellant to his car. Angela
testified that Appellant had blood on his clothes. He stated that he was going to try to
get the blood out. Appellant later stated that his mom had tried to take the blood out with
stain remover.
      Appellant's first point reads as follows:
The trial court erred in overruling Appellant's pretrial motion to suppress the video
taped statement made by Appellant where the State failed to lay a proper predicate under
Edwards.
      Prior to trial Appellant filed a motion to suppress any oral or written statement made by him,
alleging that any statements were made involuntarily and without a full understanding of and
knowing waiver of his constitutional rights. The trial court held a hearing on this motion, after
which the court denied Appellant's motion to suppress, with the exception of references to a
polygraph examination. From the four corners of the record, it is overwhelmingly clear that this
ground asserted by Appellant for suppression of the video tape is without merit.
      Now, for the first time on appeal, Appellant asserts that the video tape should have been
suppressed for a different reason, namely, that the State failed to lay a proper predicate under
Edwards. Edwards v. State, (Tex. Crim. App. 1977) 551 S.W.2d 731, 733, dealing with a
recording, sets out a seven-prong test for the admissibility of the recording as follows: (1) the
recording device was capable of taking testimony; (2) the operator was competent; (3) the
recording is both authentic and correct; (4) no changes, additions or deletions have been made;
(5) the manner of the preservation of the recording; (6) identification of the speakers; and (7) the
testimony was voluntarily made without any kind of inducement. Our Court of Criminal Appeals
in Edwards at page 733, goes on to say:
"We hold that the requirements as set out above are applicable in criminal trials as
well. However, we also find that at least some of the requirements can be inferred from
the testimony and need not be shown with the same particularity required for admission
of other mechanically required evidence, such as the results of a breathalyzer test."
      Video tapes are simultaneous audio and visual recordings of events, and given such dual
aspect, they convey greater indicia of reliability than either film or sound tapes standing alone, and
at least some elements of predicate may be inferred from testimony. Roy v. State, (Tex. Crim.
App. 1980) 608 S.W.2d 645. Without detailing the evidence, we are of the opinion and hold that
each of the elements of a proper predicate were either established by direct proof or could be
inferred from the testimony.
      Moreover, the trial judge is the sole judge of the credibility of the witnesses in a pretrial
hearing; and absent a showing by the party appealing these findings that the trial court abused its
discretion, the findings of the trial court supported by the evidence will not be disturbed on appeal. 
Lucas v. State, (Tex. Crim. App. 1989) 791 S.W.2d 35, 47; Jacobs v. State, (Tex. Crim. App.
1990) 787 S.W.2d 397, 400. This rule applies to a pretrial suppression hearing. Meek v. State,
(Tex. Crim. App. 1990) 790 S.W.2d 618, 620; Cannon v. State, (Tex. Crim. App. 1985) 691
S.W.2d 664, 673, cert. denied. On appeal the appellate court does not engage in its own factual
review but decides whether the trial judge's fact findings are supported by the record. If the trial
court's findings of fact are supported by the record, an appellate court is not at liberty to disturb
them, and on appellate review, we address only the question of whether the trial court improperly
applied the law to the facts. Romero v. State, (Tex. Crim. App. 1990) 800 S.W.2d 539 and the
cases cited at page 543.
      It is clear that the Rules of Criminal Evidence now govern criminal proceedings in our courts
except where otherwise provided. Stapleton v. State, (Tex. Crim. App. 1994) 868 S.W.2d 781. 
The admission of video tapes is authorized by Rule 1001 which defines "photographs" as including
"still photographs, X-ray films, video tapes, and motion pictures," whereas sound recordings are
included in the definition of "recordings." Rule 901 of the Rules of Criminal Evidence provides
that authentication or identification of items offered into evidence "is satisfied by evidence
sufficient to support a finding that the matter in question is what its proponent claims." Tex. R.
Crim. Evid. 901(a).
      In Kephart v. State, (Tex. Crim. App. 1994) 875 S.W.2d 319, the Court further clarified the
applicability of the rules as they relate to the admissibility of video tapes—noting that pre-rules
case law required either the Edwards test or a sponsoring witness, the Court held that Rule 901
is consistent with those cases.
      Aside from all of the foregoing, if there was error in the admission of the video tape, same
was harmless beyond a reasonable doubt. Tex. R. App. P. 81(b)(2). In the videotaped statement,
Appellant admitted to being present at the scene where the complainant was shot, but denied any
responsibility for the instant offense. Other witnesses also placed Appellant at the scene;
Appellant was therefore not further inculpated by his statement. Appellant's first point of error
is overruled.
      Appellant's second point of error asserts the evidence was insufficient to support his
conviction for aggravated robbery as a matter of law, where the evidence fails to show that
Appellant used or exhibited deadly force against the complainant, or was culpable under the law
of parties. We do not agree.
      In reviewing the sufficiency of the evidence to support a conviction, the evidence is viewed
in the light most favorable to the judgment. Flournoy v. State, (Tex. Crim. App. 1984) 668
S.W.2d 380, 383. The critical inquiry is whether, after viewing the entire body of evidence in
the light most favorable to the judgment, any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979);
Sharp v. State, (Tex. Crim. App. 1986) 707 S.W.2d 611, 614, cert. denied, 488 U.S. 872 (1988). 
The standard of review is the same for both direct and circumstantial evidence. Christian v. State,
(Tex. Crim. App. 1985) 686 S.W.2d 930, 934; Ramirez v. State, (Tex. App.—Houston [1st Dist.]
1991, pet. ref'd) 822 S.W.2d 240, 244.
      Here, the State had to prove as an element of its case that Appellant used or exhibited a deadly
weapon, namely, a firearm. We have hereinabove recited the basic evidence which includes the
use of a deadly weapon, namely, a firearm. The evidence is overwhelming to the effect that a
deadly weapon, to-wit, a firearm was used to commit the aggravated robbery in question. We
overrule Appellant's second point of error. 
      Appellant's third and final point of error reads as follows:
The evidence was insufficient to support Appellant's conviction for aggravated
robbery as a matter of fact, where the evidence fails to show that Appellant used or
exhibited deadly force against the complainant, or was culpable under the law of parties. 
      Appellant has structured his argument under this point of error in terms of a standard of
review that we believe to be inapplicable. In Meraz v. State, (Tex. Crim. App. 1990) 785 S.W.2d
146, our Court of Criminal Appeals held that the standard of review denominated as "against the
great weight and preponderance of the evidence" is generally restricted to affirmative offenses
where the burden is upon the defendant to prove his affirmative defense by a preponderance of the
evidence, plus any other factual determination where the defendant bears the burden of proof. See
Durand a/k/a Holbin v. State, (Tex App.—Houston [1st Dist.] no. 1-92-01123-CR, August 11,
1994, 22 pp.)
      In the instant case, Appellant presented no affirmative defenses, nor was there any factual
determination upon which Appellant bore the burden of proof. As such, the proper standard of
review is that enunciated in Jackson v. Virginia, supra, to-wit, the proper inquiry is whether any
rational trier of fact could have found the essential elements of the offense to exist beyond a
reasonable doubt. We overrule Appellant's third and final point of error.
      Judgment of the trial court is affirmed.
 
                                                                               JOHN A. JAMES, JR.
                                                                               Justice (Retired)

Before Chief Justice Thomas,
      Justice Vance, and
      Justice James (Retired)
Affirmed
Opinion delivered and filed September 28, 1994
Do not publish